**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

**Case No.: _____**

WIRELESS LINK, Inc., a New Hampshire
Corporation,

      Plaintiff,

vs.

IMOBILE, LLC, a New York Limited
Liability Company,

      Defendants.

_____

**COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES**

Plaintiff Wireless Link, Inc. brings this Complaint for declaratory relief and damages

against Defendant iMobile, LLC.

**INTRODUCTION**

Sprint Solutions, Inc. terminated its agreement with Wireless Link, one of its preferred

resellers of Sprint products, in September 2011, just before the iPhone launched on Sprint's

network.  Sprint handpicked a successor – iMobile, LLC – to purchase Wireless Link's 34

existing and newly-opened stores, leases, and letters of intent, which were collectively worth

over $32.4 million.  Sprint intentionally and improperly interfered with Wireless Link's

opportunities to sell its stores during a short 30-day period before which it would be terminated,

and iMobile induced and forced Wireless Link to enter into an asset purchase agreement and sell

its stores, leases, and letters of intent only to iMobile at a fraction of their value: $2.1 million.

iMobile then also breached its promise to purchase Wireless Link's inventory, and failed to pay

Wireless Link $375,000 of that $2.1 million purchase price.  The asset purchase agreement

should be declared void.  Wireless Link has claims for fraud, negligent misrepresentation, and promissory estoppel, and seeks damages totaling **$31.6 million**, which is comprised of the difference between the value of its stores ($32.4 million) and what it was paid ($1.8 million), and the value of its inventory ($1 million).

## PARTIES

1.      Plaintiff Wireless Link, Inc. is a New Hampshire corporation with a principal place of business at 6 Dove Road, Hooksett, New Hampshire 03106.

2.      Defendant iMobile, LLC is a New York Limited Liability Company with a principal place of business at 207 Terminal Drive, Plainview, New York 11803.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this Complaint under 28 U.S.C. § 1332 (diversity jurisdiction) because the parties are completely diverse in citizenship, and the amount in controversy exceeds $75,000.

4.      The Court has personal jurisdiction over Defendant because it has done business in New Hampshire, or otherwise has the requisite minimum contacts with New Hampshire so as to justify this Court exercising jurisdiction over it and, therefore, purposefully and voluntarily placed its products into the stream of commerce with the expectation that they will be purchased in New Hampshire.

5.      Venue is appropriate in this district under 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

**A.      Wireless Link**

6.      Wireless Link was founded in 2002 by Jawed Ali Shaikh.  Mr. Shaikh is a naturalized United States citizen who came to this country from his native Pakistan in 2000.  He

started his business by operating a push cart at the Fox Run Mall in Newington, New Hampshire. By August 2011, Mr. Shaikh had built his business into one of the largest Sprint dealers in the United States, with 21 operating stores, 10 additional stores under construction (planned with signed leases in place), and 20 other planned stores in New England.

7.      Wireless Link first entered into an affiliate marketing relationship with IWO Holdings, Inc. in 2002.  Wireless Link and IWO entered into a contract whereby Wireless Link would solicit and subscribe customers in New England to mobile phone service agreements and market and sell phones and related accessories – that were owned by IWO – to those subscribers. Wireless Link performed these duties by establishing, owning, and operating retail stores across the region.

8.      From 2003-2005, Wireless Link had two contracts: one with IWO and one with Sprint in order to sell to customers outside of New Hampshire.

**B.      The First Authorized Representative Agreement Between Wireless Link and Sprint**

9.      Sprint Nextel Corp. acquired IWO in 2005.

10.     In September 2005, Sprint Solutions (Sprint Nextel's subsidiary) and Wireless Link entered into an Authorized Representative Agreement ("First AR Agreement"), which replaced Wireless Link's prior contract with IWO.  Under that Agreement, Wireless Link continued the same business it was operating with IWO: it obtained a non-exclusive right to solicit and subscribe customers to Sprint's services and to market and sell Sprint's mobile phones and accessories through various retail stores in New England.  *See* First AR Agreement § 1.1.

11.     The Agreement also required Wireless Link to obtain Sprint's approval for any stores it opened or acquired.  *Id.* § 1.1(B).  The approval process required Wireless Link to

provide Sprint with information concerning the store's locations and the terms of the proposed leases between Wireless Link and commercial landlords.

### C.    Wireless Link's Rapid Growth

12.    Throughout its partnership with Sprint, Wireless Link outperformed other Sprint dealers in the area and became the No. 1dealer in the entire New England market.  Wireless Link also expanded Sprint's market share in the New England region and increased its profitability by aggressively pursuing opportunities for new stores in other under-served geographic areas.

13.    Because Wireless Link was one of Sprint's most successful dealers, Sprint decided to use Wireless Link's expertise and efforts to establish new Sprint stores in various locations in New England.  Beginning in late 2009 and through September 2011, Sprint induced Wireless Link to invest approximately $4 million in the establishment of new Sprint stores in New England.

14.    This effort was twofold.  First, Sprint enlisted Wireless Link's assistance in opening new stores consistent with Wireless Link's existing model.  Second, Sprint enlisted Wireless Link to improve existing Sprint corporate stores that were failing to achieve performance objectives.  Wireless Link would acquire these stores, and close, renovate, and re-open them after making substantial investments.

15.    In turn, Sprint promised Wireless Link, on several occasions, the opportunity to open approximately 100 locations for new stores in the future in other states, such as Connecticut, New Jersey, Pennsylvania, Florida, and California.  Based on these promises, Wireless Link worked tirelessly to open and/or renovate as many Sprint stores as possible from late 2009 to August 2011.

16.     Wireless Link opened or renovated 20 stores from 2009 through September 2011. In every instance, Wireless Link used its own funds and resources, except for a modest $100,000 subsidy from Sprint.

17.     Also, from mid-2010 through August 2011, Wireless Link made numerous investments in other aspects of its business to strengthen Sprint's position in the market and to accommodate its rapid growth.  It incurred significant employee overtime expense in order to meet Sprint's expedited goals for new store openings; hired hundreds of new employees; established a talent management team to hire and train employees; hired recruiters; hired a human resources manager; hired an in-house accountant; and established a headquarters office in Burlington, Massachusetts (to use for training and administrative purposes) and relocated there from Manchester, New Hampshire in order to be close to Sprint's regional office.

> **D.     The Second Authorized Representative Agreement Between Wireless Link and Sprint**

18.     In March 2011, Sprint and Wireless Link entered into a second Authorized Representative Agreement ("Second AR Agreement").  Under that Agreement, Wireless Link had the same non-exclusive right to solicit and subscribe customers to Sprint's services and to market and sell Sprint's mobile phones and accessories through various retail stores in New England.  *See* Second AR Agreement § 1.1.  This Agreement similarly required Wireless Link to obtain Sprint's approval for any stores it opened or acquired.

19.     The Second AR Agreement required Sprint to pay Wireless Link for its services under a commission plan that covered new activations, upgrades, and certain volume incentives. *See id.*, Ex. A.  Sprint was required to pay Wireless Link its commissions by the end of each calendar month.  *See id.*, Ex. A § 2.1.  The Second AR Agreement further provided that, if Sprint terminated the Agreement for convenience (§ 14.2), it was required to "continue to pay all

compensation due" either "as it becomes due" or in the form of "a onetime, accelerated payment in the amount of the net present value of the compensation remaining to be paid."  *See id.* § 15.2.

20.     Wireless Link proceeded under this Agreement relying heavily on Sprint's promise of a long-term relationship, as well as the promised award of a significant number of new stores, in return for Wireless Link's substantial investment in its network of stores.

### E.     Sprint's Termination of Wireless Link

21.     On August 17, 2011, following the opening of its stores in the Arsenal Mall in Watertown, Massachusetts and the Rockingham Mall in Salem, New Hampshire, Sprint's Director of Indirect Sales, John Moulison, visited Wireless Link's office and informed Mr. Shaikh that Sprint's President, Karen Paletta, had terminated the Second AR Agreement and, in doing so, Wireless Link's status as an authorized Sprint dealer would end in 30 days.

22.     Mr. Moulison failed to provide any reason or rationale for this decision.  His only explanation was that he and Ms. Paletta "do not feel comfortable dealing with you terrorists."

23.     In response, Mr. Shaikh and Mr. Faraz proposed that Wireless Link could join another mobile phone service provider as a dealer, such as Verizon, T-Mobile, or AT&T.  They could convert their Sprint stores into stores under the umbrella of whichever company they joined.  Mr. Moulison informed them that Ms. Paletta had anticipated such a proposal and had already spoken to an executive at Verizon (who happened to be her brother) and a vice president at T-Mobile (who happened to be a former manager of Sprint and a friend of Mr. Moulison).  Mr. Moulison informed Mr. Shaikh that associating with one of Sprint's competitors was not an option.

24.     For example, when Mr. Shaikh contacted T-Mobile in mid-September, initially John Diefenbach, a former Sprint manager who had become General Manager of T-Mobile's

6

New England region, expressed interest in Wireless Link.  Mr. Faras also got in touch with Ron

Smith, the New England Director under Diefenbach, who also expressed interest.  Shortly

thereafter, however, Mr. Smith informed Mr. Shaikh that T-Mobile had no further interest in

Wireless Link because Sprint told T-Mobile that Mr. Shaikh and Mr. Faraz were not good people

with which to work.

25.     Mr. Moulison later explained to Mr. Shaikh and Mr. Faraz, by telephone, that

there was "only one way out" for Wireless Link: transfer Wireless Link's stores to iMobile.

**F.     Sale of Wireless Link's Stores to iMobile**

26.     iMobile first attempted to purchase Wireless Link in 2007, when a representative

of the company emailed Mr. Shaikh and inquired about his interest in selling the company.

Wireless Link had no interest then and did not respond.

27.     In the spring of 2011, Mr. Shaikh and Mr. Faraz attended an event at a ski lodge

in Vermont.  At dinner one night, they sat at a table with the chairman of iMobile, Sam Lambda.

Mr. Shaikh and Mr. Faraz shared photos and stories of their new stores' successes.  Mr. Lambda

remarked, "I'm afraid you will take me over soon and come to New York as well."  Mr. Shaikh

responded, "Well, it's a competition, you know, I am working hard."  The next day, Mr.

Moulison confronted Mr. Shaikh, and he asked him what he said to Mr. Lambda, stating that Mr.

Paletta was angry with Mr. Shaikh.  Mr. Moulison said Ms. Paletta had received a message from

her boss stating that Mr. Shaikh had "really made us look bad."  While Mr. Moulison did not

share the contents of the message, he agreed to Mr. Shaikh's request for a meeting with Ms.

Paletta to work things out.  The meeting was not private: Mr. Shaikh and Mr. Faraz met with Mr.

Moulison and Ms. Paletta in the lounge area of the hotel with many other Sprint dealers present.

Conversing with the ski champion, Mr. Shaikh referred to Ms. Paletta as his boss.  When the

champion asked why Ms. Paletta was his boss, she interjected: "Because I can fire him any time I want to.  I can cancel his contract tomorrow."  The room fell silent, and Mr. Shaikh was humiliated.  Mr. Moulison took Mr. Shaikh aside and told him that Ms. Paletta had had a tough day, that he was proud of their hard work opening new stores, that he was with them, and that they needed to keep opening new stores.

28.     Upon information and belief, Ms. Paletta and Mr. Moulison communicated with iMobile during that event in Vermont concerning their plans to terminate Wireless Link's contract and select iMobile as the eventual recipient of Wireless Link's stores.

29.     After Wireless Link's termination in late 2011, Mr. Shaikh attempted to sell Wireless Link to Sprint's competitors.  Indeed, Wireless Link received interest from numerous prospective buyers and was presented with several proposals to sell its stores.  As of August 2011, Wireless Link's stores, proposed leases, and new stores, were collectively worth approximately $32.4 million.

30.     However, Sprint intentionally and improperly interfered with Wireless Link's prospective opportunities, and iMobile – at Sprint's urging – induced and forced Wireless Link to sell its stores only to iMobile at a fraction of their value.  Mr. Moulison consistently urged Mr. Shaikh to sell to iMobile, which Ms. Paletta had approved.

31.     One of iMobile's principals, Chetan Krishna, telephoned Mr. Shaikh from New York (iMobile's headquarters) in early September and revealed that he knew Wireless Link's contract had been canceled, and he stated Mr. Shaikh should sell the company's stores to iMobile.  Mr. Shaikh expressed no interest in selling.  A few days later, Mr. Krishna telephoned Mr. Shaikh again and informed him that Sprint would only allow Wireless Link to sell its stores to iMobile and would not approve the sale of Wireless Link's stores to any other company or

dealer.  He told Mr. Shaikh that Wireless Link had "no choice."  Indeed, Ms. Paletta informed

Mr. Krishna, Mr. Shaikh, and Mr. Faraz that Wireless Link could only sell its stores to iMobile.

32.     Under these constraints, Ms. Shaikh agreed to speak with and provide information

to both of iMobile's principals, Mr. Krishna and Sam Lambda.  On September 23, 2011, Mr.

Shaikh and Mr. Faraz traveled to New York and met with Mr. Lambda, and Mr. Krisha to

discuss the sale of Wireless Link's stores to iMobile.

33.     During this meeting, Mr. Lambda and Mr. Krisha pressed their advantages.  They

began the meeting by insisting Wireless Link was a "salvage company."  Mr. Krisha stated that

Ms. Paletta quoted them a price of $2.1 million, well below the company's fair value, and would

only approve a deal at that price.  They further stated iMobile could not pay more than that price.

They demanded Wireless Link accept a "take it or leave it" purchase price of no more than $2.1

million.  Mr. Krishna explained that Wireless Link could accept that price, or else it would lose

its stores to iMobile anyway because it had "no other option."  Mr. Krishna and Mr. Lambda also

insisted on favorable payment terms: $750,000 as a down payment, and the remaining balance in

nine (9) monthly installment payments.  (iMobile would later pay only six of those installments

and ultimately failed to pay Wireless Link approximately $375,000.)

34.     As of the date of this meeting, Wireless Link's contract with Sprint was set to

expire in 10 days.  If it did not agree to this deal substantially on iMobile's terms, Wireless Link

would be forced to absorb 30 five-to-10-year leases for its stores, and Mr. Shaikh would be

forced to absorb personal guarantees for those leases.  Accordingly, as a result of iMobile's

coercive efforts and under such duress, Wireless Link was forced to sell all of its stores to

iMobile for $2.1 million, a fraction of the company's $32.4 million valuation.  Mr. Shaikh was

ultimately forced to sign an "Asset Purchase Agreement" ("APA") with iMobile to memorialize the transaction.

### G.     iMobile's Failure to Purchase Wireless Link's Inventory

35.     In addition to forcing Wireless Link to accept less than fair market value for the sale of its stores, iMobile refused to provide Wireless Link with fair value for its inventory of Sprint products.

36.     To operate its stores, Wireless Link had to purchase mobile phones and other accessories from Sprint that it would then resell to subscribers.  After its termination, Wireless Link was left with approximately $1.1 million of Sprint product inventory.  Wireless Link could not sell the inventory on the open market or otherwise use it because these products only worked with Sprint's network.  In other words, it was worthless unless Sprint re-acquired it.

37.     The sale of Wireless Link's inventory was, therefore, critical to this deal with iMobile.  Thus, Mr. Shaikh required, as a material feature of the sale, that iMobile take and pay for Wireless Link's full inventory.  However. iMobile failed to do so.

38.     Sprint ultimately agreed to purchase only the last 30 days of inventory that Wireless Link ordered, but at a drastically reduced price.  Wireless Link made several additional attempts to move its remaining inventory back to Sprint or associated entities.  It failed to do so and disposed of that inventory in 2012, obtaining no value for it.  The approximate value of the inventory Wireless Link was forced to dispose, and the approximate difference between what Wireless Link paid Sprint when it purchased the inventory and what Sprint paid to re-acquire it was collectively $1 million.

### H.     Wireless Link's Damages

39.     iMobile's conduct has forced Wireless Link to incur approximately **$31.6 million**

in damages, including, but not limited to, the following:

- **Sale of Stores**: Wireless Link's existing and newly-opened stores, leases, and letters of intent had a sale value of $32.4 million.  Given that Wireless Link sold its stores, leases, and letters of intent to iMobile for $2.1 million, it lost approximately $30.3 million on the forced sale of its stores to iMobile.  Further, because iMobile failed to pay Wireless Link $375,000 of that purchase price, Wireless Link's damages total over **$30.6 million**.

- **Inventory**: Wireless Link lost approximately **$1 million** when it sold back its unused inventory to Sprint following its termination.

## CLAIMS

## COUNT I
### *(Declaratory Judgment)*

40.     Wireless Link repeats and incorporates by reference the allegations of the

paragraphs above as if fully stated herein.

41.     iMobile fraudulently induced Wireless Link to enter into the Asset Purchase

Agreement.  It insisted Wireless Link was a "salvage company" and demanded the only price

they would and/or could pay for Wireless Link's stores was $2.1 million, well below the

company's fair value.

42.     iMobile's representations were material.

43.     iMobile knew these representations were false.

44.     Wireless Link relied on iMobile's material statements of fact by having no choice

but to to sell its stores substantially on iMobile's terms under the constraints of the timing of its

termination and other financial circumstances.

45.     Wireless Link's reliance on iMobile's factual representations was justified.

46.     As a result of iMobile's misrepresentations, Wireless Link has suffered damages.

47.     For all of the above reasons, Wireless Link respectfully requests that this Court issue a declaratory judgment that the APA is void as a matter of law.

## COUNT II
### *(Fraud)*

48.     Wireless Link repeats and incorporates by reference the allegations of the paragraphs above as if fully stated herein.

49.     iMobile represented it could pay Wireless Link only $2.1 million for its stores.

50.     iMobile's representations were material.

51.     iMobile knew these representations were false.

52.     Wireless Link relied on iMobile's material statements of fact by agreeing, under duress, to sell its stores to iMobile for $2.1 million.

53.     Wireless Link's reliance on iMobile's factual representations was justified.

54.     As a result of iMobile's misrepresentations, Wireless Link has suffered damages.

## COUNT III
### **(*Negligent Misrepresentation*)**

55.     Wireless Link repeats and incorporates by reference the allegations of the paragraphs above as if fully stated herein.

56.     iMobile represented it could pay Wireless Link only $2.1 million for its stores.

57.     iMobile's representations were material.

58.     iMobile should have known these representations were false.

59.     Wireless Link relied on iMobile's material statements of fact by agreeing, under duress, to sell its stores to iMobile for $2.1 million.

60.     Wireless Link's reliance on iMobile's representations was justified.

61.     As a result of iMobile's misrepresentations, Wireless Link has suffered damages.

## COUNT IV
### (*Promissory Estoppel*)

62.     Wireless Link repeats and incorporates by reference the allegations of the paragraphs above as if fully stated herein.

63.     iMobile represented it would purchase Wireless Link's stores, leases, and letters of intent, but that it could pay only $2.1 million for its stores.

64.     Wireless Link relied on iMobile's representation by agreeing, under duress, to sell its stores to iMobile for $2.1 million.

65.     Wireless Link's reliance on iMobile's representations was reasonable.

66.     Wireless Link was not paid full value for its assets.

67.     As a result of iMobile's misrepresentations, Wireless Link has suffered damages.

## COUNT V
### (*Promissory Estoppel*)

68.     Wireless Link repeats and incorporates by reference the allegations of the paragraphs above as if fully stated herein.

69.     iMobile represented it would purchase Wireless Link's inventory.

70.     Wireless Link relied on iMobile's representation by agreeing, under duress, to sell its inventory to iMobile.

71.     Wireless Link's reliance on iMobile's representation was reasonable.

72.     As a result of iMobile's misrepresentation, Wireless Link has suffered damages.

## COUNT VI
### (*Unjust Enrichment/Quantum Meruit*)

73.     Wireless Link repeats and incorporates by reference the allegations of the paragraphs above as if fully stated herein.

74.     iMobile received a benefit from Wireless Link – its stores, leases, and letters of intent – as more fully described above.

75.     iMobile retained this benefit.

76.     iMobile has failed and refused to fully pay Wireless Link for this benefit.

77.     It would be inequitable to permit iMovile to retain the benefit bestowed on it by Wireless Link under these circumstances without payment by iMobile to Wireless Link of the value it received from Wireless Link.

78.     Wireless Link is entitled to judgment equal to the value of the benefit received by iMobile: $30.6 million.

### COUNT VII
### (*Unjust Enrichment/Quantum Meruit*)

79.     Wireless Link repeats and incorporates by reference the allegations of the paragraphs above as if fully stated herein.

80.     iMobile received a benefit from Wireless Link – its inventory – as more fully described above.

81.     iMobile retained this benefit.

82.     iMobile has failed and refused to fully pay Wireless Link for this benefit.

83.     It would be inequitable to permit iMovile to retain the benefit bestowed on it by Wireless Link under these circumstances without payment by iMobile to Wireless Link of the value it received from Wireless Link.

84.     Wireless Link is entitled to judgment equal to the value of the benefit received by iMobile: $1. million.

### REQUEST FOR RELIEF

WHEREFORE, Wireless Link respectfully requests that the Court:

14

A.      Declare that the Asset Purchase Agreement is void as a matter of law;

B.      Enter judgment in favor of Wireless Link;

C.      Award Wireless Link its attorney's fees and costs; and

D.      Award such other relief as is just and equitable.

## REQUEST FOR JURY TRIAL

Wireless Link requests a trial by jury on all claims for damages.

Respectfully submitted,

WIRELESS LINK, INC.

By Its Attorneys,

FOJO LAW, P.L.L.C.


Dated:  September 25, 2017                    */s/Robert M. Fojo*
                                             Robert M. Fojo (#19792)
                                             121 Bay Street
                                             Manchester, NH 03104
                                             (603) 473-4694